IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 23-209-2 |
| | : | |
| SAIKEEN DIXON | : | |

**DEFENDANT SAIKEEN DIXON'S**
**SENTENCING MEMORANDUM**

Defendant Saikeen Dixon ("Mr. Dixon") asks this Court to impose a sentence of 84 months plus one day in prison in this matter, which "is sufficient, but not greater than necessary, to achieve the purposes of sentencing." 18 U.S.C. § 3553(a). That sentence represents a downward variance from the 154 – 171 advisory guideline range detailed in the Pre-Sentence Report ("PSR").[1] This range consists of the mandatory 84-month prison term on Count Three (use of a firearm in a crime of violence) and the advisory 70 – 87 months prison term on Count Two (aiding and abetting carjacking). The unanimous decision in *Dean v. United States*, 581 U.S. 62, 71 (2017) holds that a sentencing court may consider the mandatory sentence imposed for a violation of 18 U.S.C. § 924(c), and the fact that sentence must run consecutively to the predicate offense, in determining what is "an appropriate sentence for the predicate offense." Relying on *Dean*, Mr. Dixon presents four arguments to vary downwards on Count Two, the predicate offense.

    A.    **Mr. Dixon never used or brandished the firearm**

Beginning with Count Three, the government produced no evidence that Mr. Dixon: (1) brought the gun used to commit the carjacking; (2) held the gun; (3) brandished the gun; or (4)

---

[1] Mr. Dixon has objected to this advisory guideline calculation but is including the PSR's calculation here as the Court has not ruled as of this filing.

knew if the gun was loaded or even working. Nonetheless, Mr. Dixon is facing the same mandatory 84 months in jail as his co-defendant, as well as any other defendant who uses a firearm in a crime of violence. Viewed in this light, the punishment for Mr. Dixon on Count Three is too harsh. The Court is tasked with avoiding "unwarranted sentencing disparities" in 18 U.S.C. § 3553(a)(6), as well as fashioning a sentence that accounts for the "nature and circumstances of the offense" in 18 U.S.C. § 3553(a)(1), but these sentencing goals are impeded here because the Court has no discretion to impose a lesser sentence for Mr. Dixon on Count Three.

    **B.  Mr. Dixon never entered the FedEx truck or threatened the FedEx driver**

    The mandatory and excessive punishment for Count Three highlights the need to fairly address the length of punishment for Mr. Dixon on Count Two. Once again, Mr. Dixon's conduct stands in stark contrast to his co-defendant. The government produced no evidence that the FedEx driver saw Mr. Dixon inside the black jeep or outside the black jeep. The government also produced no evidence that Mr. Dixon entered the FedEx truck, drove the FedEx truck, or attempted to open the locked door to the back of the FedEx truck. Inexplicably, the government's Sentencing Memorandum states that "Byrd and Dixon tried to open up the cargo compartment of the FedEx truck," (ECF No. 290 at 3), but the FedEx video fully refutes this claim.

    The government also failed to produce any evidence that Mr. Dixon was involved in the plan to collect a box of cocaine from the FedEx truck. To that end, the jury acquitted Mr. Dixon on Count One. Prince Alston ("Mr. Alston") never testified that he met with Mr. Dixon before, during, or after the attempt to collect the box of cocaine from the FedEx truck. Once again, the government makes a puzzling statement in its Sentencing Memorandum. It writes Mr. Dixon did not cut off the truck so his co-defendant "could steal sneakers or try his hand at driving a

2

commercial vehicle. He did it because [his codefendant] was trying to get a package containing drugs." (ECF No. 290 at 7-8.) The government misses the key point here: it has the burden to prove why Mr. Dixon acted this way, and it cannot meet that burden by pointing to the thoughts and actions of an entirely different person. Ultimately, this is a self-inflicted wound for the government. They could have alleged a conspiracy between Mr. Dixon and his co-defendant, but they never did and that choice is telling.

      **C.**      **The government's inconsistent approach to Mr. Dixon and Mr. Alston**

There is no dispute that this was a serious crime. However, there is also no dispute that this Court must balance Mr. Dixon's conduct and history against that of his co-defendant and Mr. Alston. Mr. Dixon was not on parole or probation at the time of this offense. Mr. Dixon is a loving father to his children; the government wholly ignores that aspect of his life in its Sentencing Memorandum. Further, it tried to suppress that part of his life at trial. As the Court likely recalls, the government concealed images of two children and Mr. Dixon's longtime girlfriend (Shawnae Beverly) at the zoo when it displayed a picture of Mr. Dixon's arm to the jury. Undersigned counsel showed the Court and jury the full photograph, demonstrating that Mr. Dixon is far more than what the government presents him to be.

The government's biased view of Mr. Dixon is seen again in its Sentencing Memorandum when it discusses arrests that were dismissed (in 2016 and 2017) and Mr. Dixon's open cases (in Bucks County and the Eastern District of Pennsylvania). (ECF No. 290 at 8.) The government ignores the fact that Mr. Dixon enjoys a presumption of innocence on all of those matters. The government's biased assessment of Mr. Dixon is undeniable when one considers its radically different treatment of Mr. Alston.

3

The government let Mr. Alston—who pled guilty to a serious drug offense carrying a 10-year mandatory minimum prison sentence, lied repeatedly to law enforcement, violated the terms of his federal release conditions by repeatedly abusing drugs, and stole from innocent victims for many years—walk in-and-out of the federal courthouse as if he'd done nothing wrong. The same government that alleges Mr. Dixon "has primarily supported himself with criminal activity throughout his adult life," (ECF No. 290 at 2), has turned a blind eye and deaf ear to the fact that Mr. Alston stole countless packages from FedEx for years and used those criminal proceeds to support a drug habit that exceeded $100,000 each year. The same government that asks this Court to incarcerate Mr. Dixon for 171 months, which is at the top of advisory guideline range, took a vastly different approach at Mr. Alston's sentencing.

Undersigned counsel has confirmed in writing that Mr. Alston was sentenced to a time-in sentence, plus three years of probation, by U.S. District Court Judge John Padova. The time-in sentence was slightly over 60 days in prison, which was served in local custody. In other words, Mr. Alston never served a day in a federal prison for a federal drug crime that carried a mandatory 10-year prison sentence. Most critically, the time-in sentence was *recommended* by government counsel as the appropriate punishment for Mr. Alston. The government's actions in addressing Mr. Dixon's and Mr. Alston's conduct are neither an intellectually consistent nor a fair-minded approach to sentencing in our legal system.

### D. Mr. Dixon has been incarcerated in the Special Housing Unit for six months

On June 6, 2025, Mr. Dixon and his cellmate were sent to the Special Housing Unit (the "SHU") of the Federal Detention Center (the "FDC") for a "threat assessment." There has never been a finding that Mr. Dixon violated any FDC rules warranting his detention in the SHU from

4

June 6 onwards. The FDC's explanation for why Mr. Dixon was sent to the SHU has repeatedly changed. Undersigned counsel was originally told that Mr. Dixon was sent to the SHU for fighting, then told he was sent to the SHU for instigating fights by others, and finally, told that he was sent to the SHU for his own protection. According to Warden J.L. Jamison's letter dated October 8, 2025, "[d]ue to the verified threat to your [meaning Mr. Dixon's] safety, you cannot be placed in general population in FDC Philadelphia." Mr. Dixon disputes there are any threats to his safety that justify his initial or continued detention in the SHU.

What is undisputed is that Mr. Dixon has been deprived of opportunities he otherwise had in the FDC's general population. For example, Mr. Dixon's children cannot visit him in the SHU, and this has created substantial hardship for his entire family. The SHU is now administering psychotropic medication to Mr. Dixon as he was diagnosed with depression, anxiety, and stress. Mr. Dixon has repeatedly stated he fears for his physical safety in the SHU and has written multiple letters to the Court seeking judicial assistance to protect him. It is clear that Mr. Dixon's confinement in the SHU since June 6, 2025, has been categorically different than other defendants housed at the FDC.

The legal significance of these differences for Mr. Dixon's sentencing is important. In *Gall v. United States,* 552 U.S. 48, 49–50 (2007), the Supreme Court explained "[a]s a matter of administration and to secure nationwide consistency, the [g]uidelines should be the starting point and the initial benchmark" but courts must "consider all of the § 3553(a) factors" and "make an individualized assessment based on the facts presented." The guidelines for Count Two do not address Mr. Dixon's confinement in the SHU for six months and the many issues that has created for Mr. Dixon's physical and emotional wellbeing. This Court should make an "individualized

5

assessment" of what has happened to Mr. Dixon in the SHU as that provides a compelling basis to vary his sentence downward.

Undersigned counsel submits the four variance factors discussed above, and the arguments detailed below, fully support the imposition of a sentence of 84 months plus one day in prison.

**I.** **Legal Standard**

When imposing a sentence, a district court must follow a three-step process: (1) calculate the defendant's Sentencing Guidelines sentence; (2) formally rule on any motions and state on the record whether the court is granting a departure and how any departure affects the Sentencing Guidelines calculation; and (3) exercise discretion by considering the relevant factors set forth in 18 U.S.C. § 3553(a) to impose an appropriate sentence regardless of whether it varies from the Sentencing Guidelines calculation. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). Mr. Dixon has previously raised two objections to the PSR, one addressing the calculation of the offense level and the second addressing his criminal history.

**II.** **The Offense Level**

The PSR calculates an offense level of 23 for Mr. Dixon. (*See* PSR ¶ 36.) Mr. Dixon was found guilty of Count Three, and as such, that count is not grouped with Count Two because 18 U.S.C. § 924(c) imposes a mandatory minimum term of imprisonment of seven years and it requires that such a term run consecutively to any other terms of imprisonment. *See* U.S.S.G. §§ 3D1.1(b)(1) and 2K2.4. Accordingly, the offense level of 23 applies only to Count Two. Mr. Dixon asks that this Court reject a 1-level enhancement on Count Two which claims the object of the carjacking was to retrieve a controlled substance. (*See* PSR ¶ 29.)

### A.      The Object of the Carjacking Enhancement Should be Removed

The jury acquitted Mr. Dixon of Count One, which alleged the attempted possession of more than 5 kilograms of cocaine. This acquittal provides compelling evidence that a 1-level enhancement on Count Two should not apply. From a statistical standpoint, "[o]f the 62,529 individuals sentenced in fiscal year 2022, a total of 1,613 individuals were convicted and sentenced after a trial (2.5% of all sentenced individuals), and of those, only 286 (0.4% of all sentenced individuals) were acquitted of at least one offense or found guilty of only a lesser included offense."[2] These numbers suggest Mr. Dixon's acquittal on Count One, and the 10-year mandatory prison sentence it compelled, is a rare result. That said, the government has a disturbing tendency to use acquitted conduct in its efforts to enhance a defendant's sentence.

That approach has prompted substantial commentary within the legal community,[3] and has led to the passage of Amendment 826, which modifies U.S.S.G. § 1B1.3. In particular, subpart (c) of U.S.S.G. § 1B1.3 now reads "*Acquitted Conduct*.—Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." The government's

---

[2] https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_2024-acquitted-conduct.pdf

[3] The use of acquitted conduct to increase a defendant's sentence has been a concern for many within the criminal justice system and the subject of robust debate. A number of jurists, including current and past Supreme Court Justices, have urged reconsideration of acquitted-conduct sentencing. *See, e.g.*, *McClinton v. United States*, 143 S. Ct. 2400, 2401 & n.2 (2023) (Sotomayor, J., Statement respecting the denial of certiorari) (collecting cases and statements opposing acquitted-conduct sentencing). In denying certiorari last year in *McClinton*, multiple Justices suggested that it would be appropriate for the Commission to resolve the question of how acquitted conduct is considered under the guidelines. *See id.* at 2402–03; *id.* at 2403 (Kavanaugh, J., joined by Gorsuch, J. and Barrett, J., Statement respecting the denial of certiorari), *but see id.* (Alito, J., concurring in the denial of certiorari). Many states have prohibited consideration of acquitted conduct. *See id.* at 2401 n.2 (collecting cases). And Congress is considering bills to prohibit its consideration at sentencing, with bipartisan support. *See* Prohibiting Punishment of Acquitted Conduct Act of 2023, S. 2788, 118th Cong. (1st Sess. 2023); Prohibiting Punishment of Acquitted Conduct Act of 2023, H.R. 5430, 118th Cong. (1st Sess. 2023).

Sentencing Memorandum fails to address this important change to U.S.S.G. § 1B1.3. In layman's terms, the government cannot get a second bite at the same apple by arguing Mr. Dixon's object in joining his co-defendant for the carjacking was to acquire the kilograms of cocaine.

Due to the above, Mr. Dixon should face an offense level of 22 on Count Two.

### B. Mr. Dixon's Offense Level Should be Adjusted for a Mitigating Role

Mr. Dixon asks that this Court further decrease Mr. Dixon's offense level by two levels for his minor role in the carjacking. *See* U.S.S.G. § 3B1.2(a)-(b). Under the Sentencing Guidelines, a defendant's offense level may be decreased based on their role in the offense. *See* U.S.S.G. § 3B1.2. If a defendant was a "minimal participant" in any criminal activity, then the Court should decrease the calculation by four levels. U.S.S.G. § 3B1.2(a). If a defendant was a "minor participant" in any criminal activity, then the Court should decrease the calculation by two levels. U.S.S.G. § 3B1.2(b). And if the Court believes the defendant falls between the two subsections, then it may decrease the calculation by three levels. *Id.* A minimal participant is a defendant who plays a minimal role in the criminal activity and is plainly among the least culpable of those involved in the conduct of a group. *See* U.S.S.G. § 3B1.2 cmt. 4. A minor participant is a defendant who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal. *See* U.S.S.G. § 3B1.2 cmt. 5.

This is a fact-based inquiry for the Court. It should consider various elements, including, but not limited to (1) the degree to which the defendant participated in planning or organizing the criminal activity; (2) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; and (3) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the

8

defendant performed and the responsibility and discretion the defendant had in performing those acts. *See* U.S.S.G. § 3B1.2 cmt. 3(C).

Mr. Dixon acknowledges the seriousness of the offenses for which he was found guilty. However, based on the jury's verdict, Mr. Dixon played a singular role in the events of August 9, 2022: he drove the jeep. *See generally United States v. Harris*, 47 F. App'x 322, 324 (6th Cir. 2002) (affirming district court's two-level reduction as a minor participant as the getaway driver of robbery). In the month and days leading up to the FedEx truck carjacking, co-defendant Ronald Byrd worked in tandem with Ramon "Pop" Hankins and Mr. Alston to (1) plan and orchestrate a delivery of controlled substances, (2) execute a test package run on July 13, 2022 with Mr. Alston meeting only co-defendant Mr. Byrd and Mr. Hankins after securing the test package, (3) provide a cell phone to Mr. Alston to communicate with co-defendant Mr. Byrd and Mr. Hankins regarding the August 9, 2022 package, and (4) attempt, on multiple occasions, to procure the package from the FedEx truck driver on August 9, 2022. At no point in time did Mr. Alston communicate with Mr. Dixon to obtain packages from FedEx delivery trucks in July or August. Mr. Dixon was certainly not a decision maker here, nor did he organize any of these activities. Moreover, according to Mr. Alston's testimony at trial, co-defendant Mr. Byrd—not Mr. Dixon—was in possession of a handgun prior to the FedEx truck carjacking. No exhibits or testimonial evidence were introduced that placed a weapon in the hands of Mr. Dixon at any point.

Accordingly, this Court, while recognizing the seriousness of the offenses that Mr. Dixon was found guilty of, should conclude Mr. Dixon was a "minor participant" thus making him eligible for a two-level reduction of his offense level.

Due to this reduction, Mr. Dixon would face an offense level of 20 on Count Two.

### III.     **The Criminal History Category**

Mr. Dixon hereby modifies his objection to the 1-level enhancement of his Criminal History Category ("CHC") for an arrest on May 13, 2011. (*See* PSR ¶ 38.) The time period to determine a defendant's criminal history for sentencing includes "any prior sentence that was imposed within ten years of the defendant's commencement of the instant offense." *See* U.S.S.G. § 4A1.2(e)(2). Mr. Dixon was sentenced to probation on September 25, 2012, and the instant carjacking offense "commenced" on August 9, 2022. That means the sentence was imposed nine years and 11 months before the carjacking. Stated differently, the probationary sentence counts, but just barely, because it was imposed within ten years.

That said, the impact of the 1-level enhancement is substantial because it moves Mr. Dixon from a CHC of III (i.e., 6 points) to a CHC of IV (i.e., 7 points). Mr. Dixon, like any defendant, can seek a variance from the advisory guidelines because they overstate the seriousness of the offense. Here, Mr. Dixon is asking for such a variance. As detailed in the paragraph below, the 1-level enhancement from a 2012 probationary sentence overstates the seriousness of this offense.

The PSR reports that Mr. Dixon has an offense level of 23, and a CHC of IV, which yields a 70 – 87 months advisory range on Count Two. (*See generally* PSR.) However, with an offense level of 23 and a CHC of III, Mr. Dixon would face a 57 – 71 months advisory range on Count Two. In effect, the CHC of IV yields a guideline range that is 13 to 16 months greater (at the low end and high end). It strains reason to think a probationary sentence imposed thirteen years ago on a teenager should, in 2025, counsel a federal judge in sentencing a grown man that an additional year (or more) is necessary in a federal prison. Accordingly, Mr. Dixon seeks a variance for this reason.

## IV.  18 U.S.C. § 3553(a) Factors

18 U.S.C. § 3553(a) requires sentencing courts to consider multiple factors in imposing a sentence, including, but not limited to, the nature and circumstances of the offense and the history and characteristics of the defendant. *See generally* 18 U.S.C. § 3553(a)(1)-(7). The end result of the analysis must be a sentence that is "sufficient, but not greater than necessary" to comply with four purposes of federal sentencing: (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

### A.  Personal History and Characteristics of Mr. Dixon

Mr. Dixon's personal history and characteristics are heartbreaking and justify a variance from the sentencing guidelines. Mr. Dixon has resided in Philadelphia, Pennsylvania for his entire life. His father was never involved in his childhood nor his adult life. Indeed, Mr. Dixon's father passed away in recent months while Mr. Dixon was incarcerated in the FDC. There will never be an opportunity to connect with a man who should have played a key role in his life but failed to do so. Mr. Dixon was raised by his mother and his paternal and maternal grandmothers. When Mr. Dixon turned 21, his mother passed away after a prolonged battle with kidney failure.

Mr. Dixon was repeatedly exposed to violence and drugs in his community. He has witnessed shootings and murders throughout his life; his oldest brother (Rahdeen Dixon) was shot and killed in 2006 near their North Philadelphia home. His surviving half-brother receives state benefits due to a mental disability; his half-sister has difficulty working due to her compromised

11

physical health. As a child, Mr. Dixon recalls his family was quite poor and they struggled to have sufficient food to eat or clothes to wear. He remembers being placed in foster care because Health and Human Services (HHS) determined "there was insufficient food in the house." (*See* PSR ¶ 57.)

Despite these challenges, Mr. Dixon has maintained a stable relationship with Shawnnae Beverly for over a decade. The couple have two children: Saqr and Sabr Dixon (ages 8 and 3, respectively). Mr. Dixon has consistently been involved in Saqr and Sabr's childhood. Sabr is autistic and nonverbal; thus, he needs substantial assistance from his parents. Ms. Beverly described Mr. Dixon as an "affectionate" father who "spoils" his children, and is "consistent, supportive, reliable, and loving." (*See* PSR ¶ 60.) The prolonged absence of Mr. Dixon from Sabr, a child with special needs, will require Ms. Beverly to bear the load alone, absent family members stepping in when feasible.

Mr. Dixon also has a daughter, Skaai (age 9), from a prior relationship with Shawna Cohen. Mr. Dixon's paternity was recently confirmed, and he has since established and maintained a relationship with his daughter. Skaai suffers from seizures and has a heart condition. (*See* PSR ¶ 61.) Similar to Ms. Beverly, Ms. Cohen now bears the ultimate burden of raising Skaai, a child with significant medical concerns, without the support of Mr. Dixon.[4] Mr. Dixon explained it best during his PSR interview, "[t]hey need help." *Id.*

Mr. Dixon missing the remainder of Saqr's, Sabr's, and Skaai's childhood will clearly have a detrimental impact on their relationship and on their development.

---

[4] Mr. Dixon related a recent incident where Skaai was involved in a verbal and physical altercation with two boys in her school; this apparently had a very negative impact on her emotional wellbeing.

In addition to Mr. Dixon's family history, his lack of substance abuse warrants a variance. Notably, Mr. Dixon has not used an illegal substance, nor drank alcohol. (*See* PSR ¶ 73.) In many sentencings, the defendant will qualify for a program that, once completed, reduces their overall jail term due to treatment of their addiction(s). Mr. Dixon cannot seek that benefit because, to his credit, he has been clean and sober throughout his life. This is noteworthy for many reasons, not the least of which is the trauma that Mr. Dixon has seen in his life. Where many people turn to drugs or alcohol to cope, Mr. Dixon did not. That speaks to his character and resilience as a person.

      **B.**    **Nature and Circumstances of the Case**

In the first four pages of this memorandum, undersigned counsel addressed in detail the things that Mr. Dixon did in relation to his co-defendant, Mr. Alston, and Mr. Hankins. Those facts are all incorporated here. Mr. Dixon's last offense was committed in 2013, when he was 20 years old. He vigorously defended himself at trial here, arguing he was not a participant in this crime. Mr. Dixon was deterred by his prior sentences in that he didn't commit another offense for almost a decade (and he denies that he committed these offenses). In particular, he was sentenced to 2 – 8 years in state prison in 2014, and that was sufficient to deter any convictions until 2025. What will the government's recommendation of 171 months in prison accomplish—in deterrence—that 84 months plus one day will not? Nothing.

      **C.**    **Mr. Dixon Does Not Have the Ability to Pay a Fine**

Mr. Dixon respectfully requests that this Court not impose a fine. (*See* PSR ¶ 79.) U.S.S.G. § 5E1.2(a). A defendant may meet his burden of proving his inability to pay by an independent showing or by reference to the PSR, and if so, then "the Court may not impose a fine without making findings concerning the defendant's ability to pay it." *United States v. Kadonsky*, 242 F.3d

13

516, 520 (3d Cir. 2001) (internal citations and quotations omitted). The PSR recommends that "it does not appear the defendant has the ability to pay a fine within the guideline range at this time or in the foreseeable future." (*See* PSR ¶ 79.)

Mr. Dixon has no stable income, and his only notable asset is his property at 1311 W. William Street. However, this property will serve as Mr. Dixon's home upon reentry and should not be placed as collateral to satisfy payment of any imposed fine. Therefore, the Court should waive the imposition of a fine against Mr. Dixon. *See* U.S.S.G. § 5E1.2(e) (providing courts with the authority to waive fines if defendant establishes he cannot pay fine).

## V.     Conclusion

Mr. Dixon respectfully requests this Court to vary from the Sentencing Guidelines and impose a sentence of 84 months plus one day in prison, which is sufficient but not greater than necessary to meet the goals of sentencing in this case. Mr. Dixon further requests that this Court waive any fine to be imposed against him.

Date:   December 3, 2025                                  Respectfully submitted,

**Buchanan Ingersoll & Rooney, P.C.**

By:     */s/ Jason P. Bologna*
        Jason P. Bologna (PA ID No. 82477)
        Two Liberty Place
        50 S. 16th Street, Suite 3200
        Philadelphia, PA 19102
        Telephone: (215) 665-3928
        Facsimile: (215) 665-8760
        Email: jason.bologna@bipc.com

        *Attorney for Defendant Saikeen Dixon*

14

**CERTIFICATE OF SERVICE**

I, Jason P. Bologna, hereby certify that I email and I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such to the following:

Alexander B. Bowerman, Esq.
Assistant United States Attorney

Date:  December 3, 2025                                              Respectfully submitted,

                                                                  By:    /s/ Jason P. Bologna
                                                                         Jason P. Bologna (PA ID No. 82477)

                                                                         *Attorney for Defendant*
                                                                         *Saikeen Dixon*